### Charles D. Netcher et al. v. Rebecca Bernstein.

1. Hypothetical Questions—*Proper Question to Ask Expert After the Hypothetical Statement of Facts.*—After the hypothetical statement of facts as to the manner of an accident and of the injuries resulting therefrom, it is proper to ask the expert, " Would you attribute such injuries to the accident stated in the question, or would such an accident be sufficient to produce such injuries ? "

2. Same—*Their Purpose.*—The purpose of a hypothetical question is to obtain the opinion of one entitled by superior learning or experience to speak and to express an opinion upon the state of facts which, for the purpose of his consideration, are to be received by him as true.

3. Same—*Necessary Elements.*—A hypothetical question must be put hypothetically. That it is so put must appear early in the question. Counsel may frame the question upon such theory and upon such supposed facts as he pleases, provided they are warranted by the evidence. The question should leave the jury entirely free to determine for themselves the truth or falsity of the facts assumed in it.

4. Evidence—*A Party Having Adopted a Hypothetical Question of His Adversary Can Not Complain of It.*—A party having adopted and

used a hypothetical question propounded by his adversary in the examination of his expert witnesses, will not be heard to say in this court that its use by his adversary was reversible error.

5.  APPELLATE COURT PRACTICE—*When a Verdict upon Conflicting Evidence Will Not be Disturbed.*—An appellate tribunal will not disturb a verdict where there is a conflict in the evidence, and the testimony of the successful party when considered by itself is clearly sufficient to sustain the verdict, and the verdict is not manifestly against the weight of the evidence.

6.  SAME—*When the Record Does Not State That the Instructions Therein Are All That Were Given.*—When the record does not state that the instructions therein contained as given to the jury are all the instructions which the court gave them, an appellate court is unable to say that refused instructions were not covered by those given.

7.  INSTRUCTIONS—*When a Correct Instruction May Be Refused.*— A correct instruction may be refused when its substance is embodied in others given.

8.  NEW TRIAL—*When Affidavits in Support of a Motion Do Not Set Up Controlling Facts.*—When affidavits in support of a motion for a new trial do not set up controlling and conclusive facts, the motion is properly refused.

Trespass on the Case, for personal injuries.  Appeal from the Circuit Court of Cook County; the Hon. RICHARD W. CLIFFORD, Judge presiding.  Heard in this court at the October term, 1902.  Affirmed. Opinion filed December 3, 1903.

This is an action on the case brought by appellee against appellant to recover damages for injuries received by her while in their employ.

Appellants own and run a large retail dry goods store in the city of Chicago.  In the basement of their building is a long hall from six to eight feet wide.  Near the middle of its length a door opens from the packing room.  From that room goods sold the day before which are to be delivered by wagon are carried south through this hall to the street each morning.  The girl employes enter through the hall from that street in the early morning hours, and their coming is there checked before they pass to their places in the store above.  The employe who does this checking stands in the hall south of the door to the shipping room.  The business transacted is large and the female employes are many.  The result is that in the early morning this hall is crowded with young women passing

north by the checking stand, and with men carrying goods
from the packing room to the street.   Appellee, then about
fourteen years of age, in the employ of appellants as a cash
girl, offered evidence tending to prove that in August, 1898,
at the morning hour, she came into this hall from the south;
that the hall was filled with girls making their way north
toward the checking clerk, and with men and boys passing
and repassing in their work of carrying parcels from the
shipping room to the wagons; that a man coming from the
north through this crowd with a large box on his shoulder
struck appellee in the left temple with the corner of the
box; that she soon became ill and was taken to the cloak
room, where she became unconscious, and later went home;
that she returned to work the next day, and with some
interruptions from headaches continued to work there until
September of the same year, when she started to school,
but found she could not study; that her health before this
time had been uniformly good; that September 26, 1898, she
first became seriously ill, remaining in bed three weeks;
that since then she has been in three hospitals for treat-
ment, in one of which, in December, 1898, her skull was
trephined; that she is subject to sudden attacks in which
part or all of her body becomes rigid, then trembles and
shakes, and that these manifestations are followed by faint-
ing or unconsciousness; that she is also subject to slighter
attacks during which she does not lose her balance or her
consciousness, unless that loss be momentary; that such
disease has impaired her mind and changed her character.
 · The trial resulted in a verdict and judgment in favor of
appellee.   From the order directing the entry of such judg-
ment appellants have perfected this appeal.

JACOB J. KERN, JOHN A. BROWN and W. M. McEWEN,
attorneys for appellants.

ISAAC B. LIPSON and A. J. PFLAUM, attorneys for appellee.

MR. JUSTICE BALL delivered the opinion of the court.

Appellants' objections to the hypothetical question put to
the experts called by appellee are as follows :

Netcher v. Bernstein.

1.  It is so long and involved that it is practically use-
less.  It is true that the question is long.  This is caused
by a minute detail of what counsel framing it claimed
were the manner and nature of the injury and the conse-
quences which followed; but the question is not involved or
difficult to follow.  The jury, if composed of men of aver-
age intelligence, which we must presume, were not thereby
misled or befogged.

2.  It omits certain essentials of the evidence.  When
this objection was made the court asked counsel what
essentials were omitted.  Counsel for appellant in reply
stated what those essentials were, and they were included
in the question, thus doing away with this objection.

3.  By reason of its form it substituted the doctor for
the jury.  The form of the question in this regard has been
approved by our Supreme Court.  The question here put
concludes: "Now, Doctor, on that hypothesis, can you
state * * * what, if any, relation existed between the
injuries received and those conditions which followed?"
After the hypothetical statement of facts as to the manner
of the accident and of the injuries resulting therefrom, it is
proper to ask the expert, "Would you attribute such inju-
ries to the accident stated in the question, or would such an
accident be sufficient to produce such injuries?"  "This
manner of interrogating physicians called as experts is very
common and almost unavoidable."  City of Decatur v.
Fisher, 63 Ill. 241; Wabash W. Ry. Co. v. Friedman, 41 Ill.
App. 270; I. C. R. R. Co. v. Latimer, 128 Ill. 170.

The purpose of a hypothetical question is to obtain the
opinion of one entitled by superior learning or experience
to speak and to express an opinion upon the state of facts
which, for the purpose of his consideration, are to be
received by him as true.  Girard Coal Co. v. Wiggins, 52 Ill.
App. 82.  The question must be put hypothetically.  That
it is so put must appear early in the question.  Counsel may
frame the question upon such theory and upon such sup-
posed facts as he pleases, provided they are warranted by
the evidence.  The question should leave the jury entirely

free to determine for themselves the truth or falsity of
the facts assumed in it.  Haish v. Payson, 107 Ill. 370;
Economy L., etc., v. Sheridan, 200 Ill. 441.

4.  It is incompetent and irrelevant.  Counsel must
admit that an expert can be asked a hypothetical question
within the scope of his superior knowledge and experience
if such question is kept within the bounds of the evidence.
Wherein the question here put is incompetent or irrelevant,
they do not point out; and hence this objection does not
advantage appellants.

Any objection made to this question, either of form or
of substance, was waived by the subsequent conduct of
appellants.  Dr. H. N. Moyer was called by them as an
expert witness.  In his examination they asked him :

" Q.  Now you heard the hypothetical question which
was put this morning, that long question which it took
Mr. Lipson twenty minutes to read, you heard that ques-
tion ?  A.  Yes, I heard it read.

Q.  Do you recall it well enough so that you can give us
an opinion upon it ?  A.  Yes, I think I have reasonably
good recollection of it."

Thereupon, in a response to a further question, the doctor
gave his opinion based upon the supposed facts contained
in that hypothetical question.  The same course was
pursued in the examination in chief of Dr. Leaming, an
expert witness called by appellants.

It does not require the citation of authorities to establish
the proposition that appellants, having adopted and used
this identical hypothetical question in the examination of
their expert witnesses, will not be heard to say in this court
that its use by appellee was reversible error.

Appellants further assert that the verdict is against the
weight of the evidence.

There were two points around which the evidence cen-
tered :  First—Was appellee injured in the store of appel-
lants as is charged in the declaration ?  Second—If so, are
her subsequent sufferings and disabilities the result of that
injury ?

First.  Appellee swears as to the time, place and circum-

stances of the accident.  She is supported in the general account of the accident by the witnesses Sophia Goldberg and Josephine Dusek.  The defendants' witness Desdemona Warren, who had charge of the toilet room, says that within an hour or two after the supposed occurrence of the accident she found appellee in that room in an unconscious state and there cared for her, and that she was told of the accident by Maude Carroll, cash girl No. 53, at the luncheon hour of the same day.

On the other hand appellants argue from the position in which appellee places herself and in which she is placed by her witnesses, that it was physically impossible her left temple could have been struck by a box carried on the shoulder of a man coming from the north; that Isabel Kavanagh, the checking clerk, says there was no accident at that time, nor was any one struck on the head by a box while she was there employed; that Frank Potter, who then had charge of this hall, says his attention was never called to the fact that a girl had been struck by a box; that while it was the custom to report all accidents, none of those who were in charge of the store heard of this one until two months after it is said to have occurred; and that no man such as is described by appellee and by her witnesses was ever in the employ of appellants.

Here is a serious conflict in the evidence.  In the first instance the credibility of these several witnesses, the weight of their testimony and the determination of the question as to where the truth lies, in case the jury could not reconcile the conflicting evidence, was the province of the jury.  By their verdict they have resolved these questions in favor of appellee.  An appellate tribunal will not disturb a verdict where, as here, there is a conflict in the evidence, and the testimony of the successful party, when considered by itself, is clearly sufficient to sustain the verdict, and the verdict is not manifestly against the weight of the evidence.  Bradley v. Palmer, 193 Ill. 88.  Unless we follow this rule we invade the province of the jury and reduce that distinct and essential part of the court to a nonentity.  Shevalier v. Seager, 121 Ill. 569.

Second. That appellee is now suffering and has been a sufferer since September 26, 1898, can not be disputed by any one who reads this record. The testimony of Josephine Elliott, her teacher during the years 1896–7, is that appellee "seemed to be perfectly normal, in good health, and her attendance was regular." Rosa Goldberg and Adolph Alberts, her playmates, swear that she "was always healthy." Minnie Salmovich, who had charge of the cash girls on the fourth and fifth floors of the store, testifies that she was a healthy girl. Desdemona Warren, heretofore referred to, says: "I observed her health, and she seemed to be perfectly well prior to that time. Never knew her to be sick before that time. Knew her very well, and she was always very pleasant and friendly with me."

Appellants presented evidence tending to prove that appellee while working for them was subject to headaches and had been reported sick on several occasions prior to the date of the alleged accident. If the evidence in favor of her prior good health does not preponderate, it is so strong, when compared with that showing the contrary, that we can not disturb the finding of the jury upon this question.

For four years appellee has been subject to fits or convulsions, which have undermined her general health, impaired her mental strength, and have changed her from a free-hearted, good-humored girl to one that is often sullen and inclined to strike and bite her relatives and friends. At times she has been unconscious or speechless, or insane. In search of health she has submitted not only to treatment from well-known physicians, but has also gone to three different hospitals and has there been treated. Since the trephining operation her health has greatly improved. Such has been, and is, her condition that counsel frankly state, if appellants are liable for the alleged injury, and as a result of the injury she is suffering from incurable epilepsy, that the verdict of $5,500 is not excessive. Dr. Clevinger, called by appellee, who had seen 300 to 400

cases of epilepsy, in answer to the hypothetical question says: "The relation of the injury to the condition of the girl would appear to be that of cause and effect. That the blow is the cause of the condition and the conditions are the effect." He further answered that her disease was "epilepsy," and that "there is no prospect of her recovery." He says that general epilepsy is sometimes caused by blows. He had reported a thousand of such cases from the books and had seen forty or fifty cases of traumatic epilepsy.

Dr. Albert Lowey, who has been seven years a physician in insane hospitals, in answer to the same question, says her disease is epilepsy, the blow on the head is the cause of her condition, and the disease is incurable.

The experts called by appellants testify that the disease from which appellee is suffering, as indicated in the hypothetical question, is "hysteria." Dr. H. N. Moyer, however, said on cross-examination: "If there were convulsive attacks of any kind, accompanied by loss of consciousness, not apparent, by real loss of consciousness, and if those convulsions were relieved by an operation of trephining, I would say that epilepsy was the cause of the convulsion." Two of the hospital records describe appellee's disease as "traumatic hysteria." All the experts seem to agree that hysteria may come from a blow; that epilepsy may be produced by the same cause, and yet the brain show no permanent mark of the injury, or the skull be visibly impaired. Drs. Clevinger and Lowey testify that a blow which does not break the skin may cause epilepsy.

Whether appellee is suffering from Jacksonian epilepsy or from general epilepsy, or from traumatic hysteria, is immaterial, if it be found that she was injured as charged in the declaration, and her condition after such accident and up to the date of the trial resulted therefrom; her infirmities, call them by what name you will, warrant the damages allowed by the jury.

The record does not state that the instructions therein contained as given to the jury are all the instructions which the court gave them. We are, therefore, unable to say that

the refused instruction tendered by appellants was not fully covered by the given instructions taken as a whole. Toluca M. & N. Ry. Co. v. Haws, 194 Ill. 94. Without this, the law stated in the refused instruction is substantially contained in given instructions numbered 4, 5, 6 and 7. A correct instruction may be refused where its substance is embodied in others given. W. Chi. R. R. Co. v. Lieserowitz, 197 Ill. 617.

The motion for a new trial, based upon newly-discovered evidence, was properly denied. The affidavits do not set up controlling and conclusive facts (C., R. I. & P. Ry. Co. v. Clough, 134 Ill. 586), nor do they show that the more important of these facts could not have been discovered before the trial by the exercise of reasonable diligence. For example: The deposition of Dr. Beck was taken February 1, 1902. In it the name of Dr. Denny, one of the internes at the Post Graduate Hospital, is disclosed. From him the names of the other internes and of the nurses might have been obtained. DeKraft, the newspaper reporter, visited that hospital in March, 1902, and had no difficulty in learning the names of such attendants. From these instances it appears that the same information was within reach of appellants before the trial, had they used reasonable diligence in that regard.

We find no reversible error in the record, and therefore affirm the judgment of the Circuit Court.