CARNEGIE STEEL CO. v. PATRICK ROWAN.

MASTER'S LIABILITY FOR INJURIES TO SERVANT WHILE EATING HIS DINNER IN A BUILDING HABITUALLY SO USED.

    A corporation, permitting its servants for a number of years habitually to use a building on the premises as a place to deposit their dinner pails while at work, and in which to eat their dinner, owes such servants the duty not to injure them by its negligence while they are using said building in the customary manner; and if a servant is injured while eating his dinner there, through the want of ordinary care on the part of the corporation, it is liable, although the building is used for other purposes, and although the servant would not have been injured had he remained at his usual place of work.

[For other cases in point, see 6 Cyc. Dig., "Negligence," §§ 91-100.—Ed.]

[Syllabus by the court.]

ERROR to Belmont common pleas court.

**J. C. Tallman** and **Fred Spriggs**, for plaintiff in error:

Cited and commented upon the following authorities: *Balt. & O. S. W. Ry.* v. *Cox*, 66 Ohio St. 276 [64 N. E. Rep. 119; 90 Am. St. Rep. 583]; Cooley, Torts (2 ed.) 791; *Pitts. Ft. W. & C. Ry.* v. *Bingham*, 29 Ohio St. 364 [23 Am. Rep. 751]; *Wright* v. *Rawson*, 52 Iowa 329 [3 N. W. Rep. 106; 35 Am. Rep. 275]; *Clev. A. & C. Ry.* v. *Workman*, 66 Ohio St. 509 [64 N. E. Rep. 582; 90 Am. St. Rep. 602]; *Bennett* v. *Railway*, 102 U. S. 577 [26 L. Ed. 235]; *Pomponio* v. *Railway*, 66 Conn. 528 [34 Atl. Rep. 491; 32 L. R. A. 530; 50 Am. St. Rep. 124]; *Cin. H. & D. Ry.* v. *Aller*, 64 Ohio St. 183 [60 N. E. Rep. 205]; *Galveston Oil Co.* v. *Morton*, 70 Tex. 400 [7 S. W. Rep. 756; 8 Am. St. Rep. 611]; *Benson* v. *Traction Co.* 77 Md. 535 [26 Atl. Rep. 973; 20 L. R. A. 714; 39 Am. St. Rep. 436]; *Columbus, H. V. & T. Ry.* v. *Gaffney*, 65 Ohio St. 104 [61 N. E. Rep. 152]; *Coal Co.* v. *Estievenard*, 53 Ohio St. 43 [40 N. E. Rep. 725]; *Woolwine* v. *Railway*, 36 W. Va. 329 [15 S. E. Rep. 81; 16 L. R. A. 271; 32 Am. St. Rep. 859]; *Harriman* v. *Railway*, 45 Ohio St. 11 [12 N. E. Rep. 451; 4 Am. St. Rep. 507]; *Bellefontaine & Ind. Ry.* v. *Snyder*, 18 Ohio St. 399 [98 Am. Dec. 175]; *Plummer* v. *Dill*, 156 Mass. 426 [31 N. E. Rep. 128; 32 Am. St. Rep. 463]; *Cleveland, T. & V. Ry.* v. *Marsh*, 63 Ohio St. 236 [58 N. E. Rep. 821; 52 L. R. A. 142]; *Kennedy* v. *Chase*, 119 Cal. 637 [52 Pac. Rep. 33; 63 Am. St. Rep. 153]; *Chicago & A. Smelt. & Ref. Co.* v. *Collins*, 43 Ill. App. 478; *Severy* v. *Nickerson*, 120 Mass. 306 [21 Am. Rep. 514]; *Byrket* v. *Rail-*

Steel Co. v. Rowan.

*way,* 29 O. C. C. 614, affirmed by the Supreme Court, without report, *Byrket* v. *Railway,* 75 Ohio St. 625; *Balt. & O. Ry.* v. *Wilson,* 31 Ohio St. 555; *Knox Co. Bank* v. *Lloyd,* 18 Ohio St. 353; *Clev. C. C. & St. L. Ry.* v. *Martin,* 13 Ind. App. 485 [41 N. E. Rep. 1051]; *Chicago & O. Coal & Car Co.* v. *Norman,* 49 Ohio St. 598 [32 N. E. Rep. 857]; *St. Louis, A. & T. Ry.* v. *Welch,* 72 Tex. 298 [10 S. W. Rep. 529; 2 L. R. A. 839]; *International & G. N. Ry.* v. *Ryan,* 82 Tex. 565 [18 S. W. Rep. 219]; *Broderick* v. *Railroad Station & Depot Co.* 56 Mich. 261 [22 N. W. Rep. 802; 56 Am. Rep. 382]; Elliott, Evidence Sec. 1080; Greenleaf, Evidence (16 ed.) Sec. 4412.

C. J. Lynch, J. B. Handlan and Paul Jones, for defendant in error.

COOK, J.

Plaintiff in error was engaged in the manufacture of steel and in connection with its works had several blast furnaces. In a blast furnace there are a number of water blocks inserted for the purpose of keeping the walls of the furnace as cool as possible. In this furnace there were at least two hundred of these blocks. The blocks are made of a certain character of bronze metal adapted to the purpose, and are about twenty-six inches long, oblong in shape corresponding with the outside of the wall, extending through the wall twenty-seven inches tapering to what is called the nose and are five or six inches deep. These blocks are at the lower part of the furnace where the heat is most intense and run around the furnace in rows, one above the other. They are connected together so that the water circulates freely through all of them from a tank located considerably higher than the blocks and finally emptying into a well in the ground.

Defendant in error, Rowan, was employed by the company to mix clay which was used about the different furnaces; and his box at which he worked was from seventy-five to a hundred feet from the furnace when the accident occurred. He had nothing further to do with the working or operation of the furnace.

For two or three days before the accident it had been observed by the superintendent and men connected with the operation of the furnace that one of the blocks had become impaired and was leaking, but not to such extent as to require immediate removal. A block is ordinarily removed during a cast, when the blast is off, and the pressure is reduced to the minimum. The evening before the accident the superintendent gave notice to his men in charge of the furnace to prepare the impaired block for removal, and the men did so during the night by removing the casing all around the block, which is made of cement about one-half inch thick, to a depth of ten inches into the wall. Casts are made at three,

six, nine and twelve o'clock in the first half of the day and at the same time in the last half. The superintendent came at eight o'clock in the morning and it was his intention to remove the block at the nine o'clock cast but he changed the time to twelve for the reason, as claimed, that some difficulty had arisen in the water appliance and that the water was not circulating as freely through the blocks as it should do. After the nine o'clock cast was made the supply of water became more impaired and at twelve o'clock the blocks became considerably overheated. After the cast was made at twelve o'clock, which lasted some forty-five minutes, the blast was again put on, perhaps inadvertently, as it was evidently the intention of the superintendent to remove the block at the twelve o'clock cast. Soon after the blast was put on, a very short time, it was observed that this block had become very much overheated, indeed, red hot, and before the engine could be stopped and the blast taken off, the block was forced from its place and the hot metal was forced through the aperture striking a small building, which was about twenty feet away, in which Rowan and others were just finishing their dinner, whereby all of them were badly burned, also a man by the name of Lowe, who was not in the building. Rowan's injuries were very serious. This building in which Rowan had just finished eating his dinner was about sixty feet from the box at which he worked and the box was not at all in line with the escaping metal, and if he had been at his box or close to it he would not have been injured. The building was a small frame structure twenty-eight by twelve feet and was used for different purposes, primarily, however, for storing clay, keeping it warm and pliable, so that it would be ready for use at any time. A stove was in the center of the building and the clay was in one end. At the other end and around the sides, up to the stove, benches had been placed by the men who used them while eating their dinners; nails had been driven in the walls on which the men hung their clothes while at work and their dinner pails were left there.

The employes had been in the habit of using this building in which to eat their dinners when the weather was inclement for fifteen or twenty years; and Rowan had been in the habit of eating his dinner there for a long time, as the company's agents well knew, the superintendent of the furnaces frequently eating his dinner there. There were other buildings of a similar character scattered through the premises of the company which were used by other employes in a similar manner. There were about fifteen hundred employes of the company and nearly two-thirds, or one thousand, ate their dinners on the premises. The employes were allowed fifty minutes to get their dinners at the noon hour. The day Rowan was injured was in January and the weather very inclement.

The verdict and judgment below was against plaintiff in error and it is now sought to reverse the judgment upon two grounds: First, the verdict is against the evidence; second, there was error in the charge of the court.

It is claimed the verdict is against the evidence for two reasons: First, there was no negligence upon the part of defendant causing the injury; and, second, if there was, the negligence was the act of a fellow servant.

In the case of *National Steel Co.* v. *Lowe,* 14 O. F. D. 595 [127 Fed. Rep. 311; 62 C. C. A. 229], arising out of the same accident, the question of the negligence of the company and also the question whether or not the rule of fellow servant applied were fully considered, and it was in that case held:

"1. Plaintiff, a stove tender in defendant steel-works, was burned by molten iron from a blast furnace, caused by a water block being forced from the wall of the furnace. The block had become defective on the evening of the previous day, and the superintendent ordered preparations made to remove it. That evening the packing was removed to a depth of nine or ten inches, and between seven and eight o'clock the next morning the superintendent, though it had been his intention to remove the block when the blast was off the furnace during the nine o'clock cast, on his being notified that the water was not running freely through the different blocks, by reason of the strainer being clogged, directed that the block should not be removed until twelve o'clock, and that the water strainer be repaired at the same time. Before noon, and while the blast was still on the furnace, and as certain workmen were preparing to pull out the block, the inside of which had become melted off by reason of the defect in the water apparatus, the block was suddenly forced from the wall by the pressure in the furnace, and plaintiff was burned by the flame and molten material issuing from the aperture: *Held,* that, whether treated as a place at which to work or an appliance with which to work, it was the positive duty of the company to keep the furnace reasonably safe for its employes at work about it. For any neglect to do this, the company was responsible, as the duty could not be delegated.

"2. Whether the neglect was that of the superintendent or foreman, or a workman, in neither case was the person guilty of negligence a fellow servant of the plaintiff, so as to relieve the company of responsibility."

We have examined that case with care and we are content with the

### Belmont County.

judgment and decision of the court, and that case makes it unnecessary to consider those questions further.

There is one question, however, made in this case that was not made in *National Steel Co.* v. *Lowe, supra,* and that is, the degree of care that was required of the steel company toward Rowan at the time of the injury.

On behalf of the steel company it is claimed that Rowan at the time of his injury was not engaged in the business of the company; that he was a mere licensee and that it owed him no duty save and except it should not wilfully injure him by its gross negligence; while upon the part of Rowan it is claimed that the company owed him the duty of ordinary care. This question is made in the requests of both parties and in the charge itself; the court taking the view that the company at the time of the injury owed Rowan the duty of exercising ordinary care, and charged the jury, that although Rowan was in the building at his dinner at the time of the accident, and would not have been injured had he been at his clay box or close to it, yet, the duty of exercising ordinary care devolved upon the steel company.

We think the trial judge was right in his instructions to the jury. As we have seen from the statement of facts this building had been used in the manner Rowan used it for a long number of years. It was suitable, convenient and reasonably necessary for the purpose of providing a place where the employes could eat their dinners in inclement weather. Rowan had been in the habit of eating his dinner there since he entered the employ of the company. All this was known to the officers and agents of the company. This certainly was an invitation to the employes to so use the building.

In the case of *Cleveland, C. C. & St. L. Ry.* v. *Martin,* 39 N. E. Rep. 759 (Ind.), it was held:

"In an action against a railroad company for the death of an employe, it appeared that deceased was employed to work on the side tracks of defendant, at a point near which defendant had a pump house, and that it was the custom of defendant's employes at work at that point to eat their dinners in the house, it being the only place in which they could keep warm. The time given deceased for his dinner was so short that he was unable to go home, and defendant never objected to its employes using the pump house during dinner time. Deceased, while eating his dinner in the pump house on a very cold day, was killed by an escape of steam, resulting from defects in a boiler in the house: *Held,* that defendant was liable."

In the opinion the question of mere license and invitation is fully

discussed, and it is clearly shown that the appellant was not a licensee but was at the pump house by invitation.

In the case of *Taylor* v. *Bush,* 61 Atl. Rep. 236 (Del.), it was held:

"1.   A day laborer, who by virtue of his employment, is permitted to carry his dinner to his work, and eat it on his employer's premises during the noon hour, and leave his pail on the premises until the day's work is done, continues to occupy towards his employer the relation of a servant on going to get his pail at the close of the day, although his day's work is then done, and he has received his day's pay.'"

In the opinion it is said, page 242:

"It appears that the plaintiff, Lewis E. Taylor, on the day of the accident, was in the employ of the defendant company, and had been in their employ for about three months immediately preceding that day; that in the course of his employment, from day to day, he was in the habit of taking his dinner pail to the stable in the morning, eating his dinner on the premises at noon time, and, after the day's work was over, of taking his dinner pail away from the place where he had kept it during the day; that this privilege was incident to, and connected with, the employment, extended to him as an employe, and by that right he took his pail there, kept it there, and took it away from there at the close of each day; that at the time of the accident he had been actually paid at the office for that day, and had gone, as was his custom, to the stable to take home his dinner pail.  He was therefore in the employment of a privilege which was granted to him by his employers only as an employe.  It was connected with, and incident to, his employment at the time of the accident, and the enjoyment of it therefore continued unbroken the relation of master and servant, at the time of the accident, between the plaintiff and the defendant company."

These cases, it seems to us, fully support the charge of the court.

The case of *Pomponio* v. *Railway,* 50 Am. St. Rep. 124 [66 Conn. 528; 34 Atl. Rep. 491; 32 L. R. A. 530], is very much relied upon by counsel for the steel company.  In that case it was held that the distinction between a mere licensee and a person upon premises by invitation was whether the privilege of user exists for the common interests or mutual advantage of both parties.  If it was, then it was by implied invitation; and it is claimed that the use of this building was of no advantage to the steel company.

Can that be so?  Was it not to the advantage of the steel company for its employes to have a comfortable place on an inclement day in which to eat their dinners during the fifty minutes of noon hour?

'The company so understood it by permitting them to use the building, knowing their comfort would be subserved and their capacity for more and better work secured, saying nothing for the dictates of humanity.

But, conceding that Rowan was a mere licensee, would not the steel company be held to ordinary care in a case of this character? This is not a case in which the premises were not kept safe; suffered to go to decay, and injury resulted from such negative act. These men were in this building with the knowledge and consent of the company. There had been no revocation of the license, or notice given to not enter the building upon that day, and while there, by the active negligence of the company, Rowan was injured. The superintendent was there doing this work of removing the block and by his negligence, as he then knew or should have known, the block was blown out.

An owner of premises may permit a licensee to come upon his premises and travel over an excavation covered over and, if the plank rot out and the earth give way without his knowledge and the licensee, while using the premises as he was accustomed to do, falls into the pit and is injured, the owner may not be responsible, but can he remove the plank and permit the excavation to remain open without revoking the license or notice to the licensee, permit him to continue to use the premises without being responsible? We think not.

In the case of *Pomponio* v. *Railway, supra*, it was held:

"With respect to the safety of the premises of a landowner, he owes a more limited duty to a mere licensee than he does to a person who is there by invitation, either express or implied; but he owes to both the equal duty of not injuring either by his own active negligence, and is liable if he does so.

"A railroad company, which has for years maintained a planked crossing upon its tracks for the use of a manufacturing company having shops extending along either side of the railroad, is liable for its negligent act in switching its cars at the crossing, whereby a person going to his work at one of the shops, after the noon intermission, is, without fault upon his part, struck and killed, whether he is upon the crossing as a licensee, or by implied invitation."

In the opinion it is said, page 129:

"The defendant contends that the decedent was upon the crossing as a mere licensee, and, consequently, that its duty toward him was a more limited one than if he had been there upon its implied invitation. As a general statement, it is undoubtedly true that an owner in charge of land owes a more limited duty to a mere licensee than he does to a party invited, in the technical sense of that word. A licensee must

take the premises as he finds them, and the owner is not, as to him, bound to use care and diligence to keep the premises safe while he does owe such a duty to one using his premises upon invitation. 'It has often been held that the owner of land or a building who has it in charge, is bound to be careful and diligent in keeping it safe for those who come there by his invitation, express or implied, but that he owes no such duty to those who come there for their own convenience, or as mere licensees.' *Plummer* v. *Dill*, 156 Mass. 426, 427 [31 N. E. Rep. 128; 32 Am. St. Rep. 463]. This distinction between the case of a licensee and that of a party invited, in respect to the duty of keeping the premises safe for their use, is recognized in the following cases and in many others: *Nicholson* v. *Railway*, 41 N. Y. 525, 532; *Barry* v. *Railway*, 92 N. Y. 289 [44 Am. Rep. 377]; *Byrne* v. *Railway*, 104 N. Y. 362 [10 N. E. Rep. 539; 58 Am. Rep. 512]; *Sweeny* v. *Railway*, [92 Mass.] 10 Allen 368 [87 Am. Dec. 644]; *Gordon* v. *Cummings*, 152 Mass. 513 [25 N. E. Rep. 978; 9 L. R. A. 640; 23 Am. St. Rep. 846].

"But while this is so, it is also true that the landowner must not himself, by what has been called 'his own active negligence,' injure either the licensee or the party invited, while they are upon his land. This is a duty due to both equally. Toward both, in this respect, he is bound to exercise the same amount of care. Both are upon his premises, not as wrongdoers, but by his permission, and, in respect to the duty in question, we know of no good reason why the nature and extent of it should not be the same in cases of license as in cases of invitation. In a Massachusetts case it appeared that the plaintiff, being sent by his mother upon an errand, passed through a passageway upon the defendants' premises, over a portion of which a roof had been constructed; and that it was the defendants' habit to supply ale to their workmen, who were accustomed to throw the empty ale kegs out of a window down upon this roof, from which from time to time the kegs were taken away. Just as the plaintiff, in going through the passageway, emerged from under this roof, one of the workmen threw a keg so carelessly that it fell off the roof and injured the plaintiff. It was held that the defendants were liable, and that it made no difference whether the way was public, and thus the plaintiff was traveling upon it as a matter of right, or whether it was private and he was traveling upon it merely by permission. The court said: 'Even if he were there under a permission which they might at any time revoke, and under circumstances which did not make them responsible for any defect in the existing condition of the way, they were still liable for any negli-

gent act of themselves or their servants which increased the danger of passing and, in fact, injured him.' *Corrigan* v. *Sugar Refinery*, 98 Mass. 577 [96 Am. Dec. 685].

"In another Massachusetts case the court says: 'The licensor has, however, no right to create a new danger while the license continues. *Oliver* v. *Worcester*, 102 Mass. 489, 502 [3 Am. Rep. 485]; *Corrigan* v. *Sugar Refinery*, 98 Mass. 577 [96 Am. Dec. 685]; *Corby* v. *Hill*, 4 Com. B., N. S., 556. So a railroad company, which allows the public habitually to use a private crossing of its tracks, cannot use active force against a person or vehicle crossing under a license, express or implied.' *Stevens* v. *Nichols*, 155 Mass. 472, 475 [29 N. E. Rep. 1150; 15 L. R. A. 459].

"In a New York case the court said: 'There can be no doubt that the acquiescence of the defendant, for so long a time, in the crossing of the tracks by pedestrians, amounted to license and permission, by the defendant, to all persons to cross the tracks at this point. These circumstances imposed a duty upon the defendant, in respect of persons using this crossing to exercise reasonable care in the movement of its trains. The company had a lawful right to use the tracks for its business, and could have withdrawn its permission to the public to use its premises as a public way, assuming that no public right therein existed; but so long as it permitted the public use, it was chargeable with knowledge of the danger to human life from operating its trains at that point, and was bound to use such reasonable precaution in their management as ordinary prudence dictated to protect wayfarers from injury. * * * The ground of liability in this case is negligence, and the duty of the defendant to exercise reasonable care existed irrespective of the fact whether the plaintiff's intestate had a fixed legal right to cross the track, or was there simply by the defendant's implied permission.' *Barry* v. *Railway*, 92 N. Y. 289, 293 [44 Am. Rep. 377]."

Such we also understand to be the holding of our own Supreme Court. *Harriman* v. *Railway*, 45 Ohio St. 11 [12 N. E. Rep. 451; 4 Am. St. Rep. 507]; *Cincinnati, H. & D. Ry.* v. *Aller*, 64 Ohio St. 183 [60 N. E. Rep. 205]; *Cleveland, T. & V. Ry.* v. *Marsh*, 63 Ohio St. 236 [58 N. E. Rep. 821; 52 L. R. A. 142]; *Cleveland, A. & C. Ry.* v. *Workman*, 66 Ohio St. 509, 540 [64 N. E. Rep. 582; 90 Am. St. Rep. 602].

In the case of *Cincinnati, H. & D. Ry.* v. *Aller, supra*, Judge Shauck, in the opinion on pages 193 and 194, says:

"But it is urged that in the circuit court it was thought, and rightly, that the judgment under review was required by the later case of *Harriman* v. *Railway*, 45 Ohio St. 11. Attention to the facts

Steel Co. v. Rowan.

presented in the cases will show that in the legal view they are ma-terially different. In the present case there has been a recovery because the end of the platform as it had been constructed six years before the accident and maintained without change, was not constructed or guarded so as to make it a safe way for footmen passing from the junction to the village, although such use was not within any invitation which the company extended to the public. While in *Harriman* v. *Railway,* the recovery was by one who was upon the grounds of the company by permission only, the injury was not occasioned by any real or alleged defect in the construction of the road. The injury there resulted from the operation of the road. The doctrine of the case is that when the company became aware that persons were using the road for purposes of their own it became its duty, not to alter the construction of its road, but to operate it consistently with the facts thus known to it. It was held to be a violation of that duty to add new and further peril to such permitted use without taking precaution against injuries which would naturally result therefrom. Not only does such added peril from the operation of the road appear as a fact in the case, but in the syllabus it is stated, as a ground of recovery; and in the opinion the question for decision is stated as follows: 'An owner may, without protest or objection, permit his premises to be used by the public so long, in the same condition, that his acquiescence in the continuation of such use, until some warning or notice on his part, might reasonably be expected; and if under such circumstances and with knowledge of the same, he should place or leave some new, dangerous structure or instrument in the way so used, and from which he might reasonably apprehend danger of injury to those accustomed to such use, can he claim exoneration from liability in case such injury shall occur, on the ground that the law imposed no duty on him to keep his premises in a safe and suitable condition for trespassers and licensees who enter by permission only?' "

Judgment of court of common pleas will be affirmed.

**Burrows** and **Laubie, JJ.,** concur.